UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CLARENCE A. WOODS,

    Plaintiff,     CIVIL ACTION NO. 09-13037

  v.         DISTRICT JUDGE VICTORIA A. ROBERTS

COMMISSIONER OF     MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

## I. PROCEDURAL HISTORY

### A. *Proceedings in this Court*

On July 31, 2009, Plaintiff filed the instant suit seeking judicial review of the

Commissioner's decision disallowing benefits (Dkt. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B)

and Local Rule 72.1(b)(3), this matter was referred to the undersigned for the purpose of

reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability

insurance benefits (Dkt. 3). This matter is currently before the Court on cross-motions for

summary judgment (Dkt. 9, 12).

### B. *Administrative Proceedings*

Plaintiff filed the instant claims on September 3, 2002, alleging that he became unable to

work on May 29, 2002 (Tr. 43). The claim was initially disapproved by the Commissioner on

December 9, 2002 (Tr. 27). Plaintiff requested a hearing and on October 12, 2004, Plaintiff

appeared with counsel before Administrative Law Judge (ALJ) Bennett S. Engelman, who considered the case *de novo*. In a decision dated October 7, 2005, the ALJ found that Plaintiff was not disabled (Tr. 14-21). Plaintiff requested a review of this decision on November 1, 2005 (Tr. 9). The ALJ's decision became the final decision of the Commissioner when the Appeals Council, on March 30, 2006, denied Plaintiff's request for review. (Tr. 4-6); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004).

Plaintiff sought judicial review of the ALJ's decision in the United States District Court (Civil Action No. 06-11828). On November 7, 2006, Judge Paul D. Borman remanded the case pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings based on the Defendant's uncontested motion to remand (Tr. 298). The Appeals Council then remanded the case to the ALJ to clarify whether Plaintiff could perform his past work as a lathe operator in light of the vocational expert's testimony that such work would not allow Plaintiff to sit during the day (Tr. 303).

A subsequent hearing was held on April 2, 2007, at which Plaintiff appeared with counsel and testified (Tr. 336-351). On February 4, 2008, a partially favorable decision was issued by ALJ Engelman, finding that Plaintiff was disabled beginning in March 2007 – when he turned 55 years old – as he met the "Grid" criteria for disability under 20 C.F.R. part 404, subpart P, appx. 2 (Tr. 266-275). In view of the remand order questioning whether Plaintiff's past work as a lathe operator allowed for his being able to alternate between sitting and standing at will and the vocational expert's testimony at the April 2 2007 hearing, the ALJ found that Plaintiff was unable to perform his past relevant work. However, the ALJ also found that, prior to March 9, 2007 – when Plaintiff was younger than 55 – there were a significant number of "light work"

jobs in the national economy that Plaintiff could have performed. These jobs included machine operations positions (5,600 jobs), assembly jobs, (9,000 jobs), and inspection positions (4,700 jobs) (Tr. 273-274).

In light of the entire record in this case, I find that substantial evidence supports the Commissioner's determination that Plaintiff was not disabled prior to March 2007. Accordingly, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    STATEMENT OF FACTS

### A.    *ALJ Findings*

Plaintiff was 55 years of age at the time of the most recent administrative hearing (Tr. 273). Pursuant to the District Court's remand order, the ALJ's task was to clarify whether the Plaintiff's past relevant work as a lathe operator would have allowed him to sit during the day, and therefore be within Plaintiff's residual functional capacity for "light work," as found in the ALJ's first decision (Tr. 267).

On remand, at step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 29, 2002 (Tr. 268). At step two, the ALJ found that Plaintiff had the following "severe" impairments: a lumbar disc protrusion, history of bilateral hernia repair, and coronary artery disease (Tr. 269). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listings impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d)) (Tr. 269). Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity (RFC) to

perform light work except that Plaintiff "requires the opportunity to alternate between seated and standing positions" (Tr. 270). In making this finding, the ALJ rejected the opinions of Plaintiff's treating physicians – Drs. E.N. Chardoul and Sael Sahouri – as the ALJ found that these physicians merely accepted Plaintiff's subjective complaints at face value and that these medical opinions were not supported by additional objective medical rationale (Tr. 272). The ALJ also found that his prior RFC finding was not contradicted or challenged in any way by Judge Borman's and the Appeals Counsel's remand orders, and that any new evidence submitted does not warrant overturning the ALJ's prior RFC finding – which concluded that Plaintiff could perform "light" work with the option to sit or stand during the day. *Id.*

At step four, the ALJ found that Plaintiff is unable to perform any past relevant work, as Plaintiff's prior work as a lathe operator would not allow Plaintiff to sit or stand at will throughout the work day (Tr. 273). The ALJ next found that Plaintiff was 50 years on the alleged onset date of disability, which is defined in the regulations as an "individual closely approaching advanced age" and, on March 9, 2007, Plaintiff turned 55, at which time his age category changed to an "individual of advanced age." *Id.*

At step five, the ALJ concluded – based on the vocational expert's (VE) testimony – that Plaintiff could perform a significant number of jobs (Tr. 273-74). The ALJ then found that when Plaintiff turned 55 years old, Grid rule 202.01 directed a finding that he was disabled as of that date (Tr. 275). Grid rule 202.01 provides that a person is disabled if he can perform at most light work, is of advanced age (defined as 55 or older pursuant to 20 C.F.R. § 404.1563), has a limited education, and only unskilled work experience. *See* 20 C.F.R. part 404, subpart P, Appx. 2.

### B.    *Administrative Record*

### 1.    **Medical Evidence**

Plaintiff only disputes the ALJ's assessment of his back and heart conditions. Therefore, medical evidence concerning Plaintiff's other conditions need not be recounted in this Report and Recommendation.

In August 1995, Plaintiff underwent a cardiac catheterization (insertion of a catheter into the heart for diagnosis or treatment) and an angioplasty (procedure to reopen narrowed blood vessels) of the right coronary artery after presenting to the emergency room complaining of episodic chest discomfort, tightness, heaviness, and a sensation of pain or pressure (Tr. 96-102). Plaintiff presented to the emergency room two days later with a complaint of squeezing chest pain and an EKG revealed acute inferior myocardial infarction (Tr. 104). A second cardiac catheterization revealed occlusion of a right coronary artery and doctors performed a double coronary artery bypass graft (Tr. 106-08).  Plaintiff was discharged four days after surgery (Tr. 105).

Between September 1995 and December 2001, Plaintiff presented to Dr. Chardoul, an internist, and Ms. Graham, a physician's assistant in Dr. Chardoul's office, on numerous occasions for monitoring of his heart condition and hyperlipidemia (high cholesterol) (Tr. 169-88).  Plaintiff occasionally complained of chest pain or pressure often following stress or anger at work, as well as fatigue and shortness of breath (Tr. 169-70, 173-74, 177-78, 180, 183, 185-87). During this period, Plaintiff initially quit smoking, but then resumed the habit (Tr. 169-88). In early 1996, Dr. Chardoul recommended that Plaintiff should lift no more than 10 pounds, avoid above-head work, and not work on an automated line for one year (Tr. 187).  Dr. Chardoul

renewed Plaintiff's restrictions in October 1997 and April 2000 (Tr. 183). In May 2001, Plaintiff reported worsening anginal symptoms (chest pain or pressure due to inadequate blood flow to the heart muscle), for which he was taking nitroglycerine and Dr. Chardoul recommended that he stay home from work for one week (Tr. 171). Plaintiff presented to Dr. Chardoul in December 2001 and reported that he had an episode of some chest pain and shortness of breath; Dr. Chardoul referred Plaintiff to Dr. Rivera (Tr. 169).

Plaintiff presented to Dr. Rivera, a cardiologist, in January 2002 with complaints of episodic tightness of the chest with difficulty breathing and exhaustion on exertion (Tr. 130). On examination, Plaintiff displayed normal heart sounds and had a normal electrocardiogram (Tr. 130). Dr. Rivera advised Plaintiff to stop smoking immediately and permanently, recommended increasing his cholesterol medication dosage, and suggested a stress test (Tr. 130). The stress test, conducted later that month, revealed two left ventricle defects, one of moderate size and mild severity, and the other of large size and moderate severity (Tr. 127). Plaintiff returned to Dr. Rivera in February 2002 and reported that his episodic chest pain had disappeared (Tr. 126). Dr. Rivera reported that Plaintiff was doing well, but that he was still smoking; Dr. Rivera scheduled a six-month follow-up appointment (Tr. 126).

Plaintiff returned to Dr. Chardoul on May 24, 2002, with complaints of severe lower back pain in the right lumbosacral region (LS) causing right-sided sciatica (pain radiating from the lower back down the leg) (Tr. 168). A straight-leg rasing test was positive at 35-40 degrees (Tr. 168). Dr. Chardoul prescribed Vicodin, for pain (Tr. 168).

An x-ray of Plaintiff's hips and lumbar spine performed on May 29, 2002, revealed slight osteoarthritic changes (Tr. 210). In May 2002, a doctor performed an electromyography study

(EMG) due to Plaintiff's complaints of lower back and right leg pain (Tr. 133). The study revealed a very mild or electromyographically evolving right S1 radiculopathy (a nerve root condition) (Tr. 133). An MRI of Plaintiff's lumbar spine performed the same day revealed a small paracentral disc protrusion at L5-S1 on the right side compromising the lateral recess and the nerve root exiting on the right side (Tr. 212).

Plaintiff presented to Dr. Chardoul and Ms. Graham in June 2002 with complaints of lower back pain and radicular pain down the left leg with numbness and tingling (Tr. 167). On examination, Plaintiff displayed a positive straight leg raise on the left and Ms. Graham recommended Flexiril (a muscle relaxant) and physical therapy (Tr. 167). Plaintiff had similar complaints during a second visit in June 2002 and on examination displayed a positive straight leg raise, decreased deep tendon reflexes on the right, and muscle spasms (Tr. 167). Dr. Chardoul recommended not working and scheduled a follow-up appointment for later that month (Tr. 167). During the follow-up appointment, Plaintiff stated that he was tired and could not walk any distance (Tr. 166). On examination, Plaintiff had a positive straight leg raise at 35 degrees and Dr. Chardoul recommended staying off of work, attending physical therapy, and taking analgesics (Tr. 166).

Plaintiff returned to Dr. Chardoul in July 2002 with continuing complaints of pain, and on examination he had a positive straight leg raise at 35 to 40 degrees on the right and tenderness over the right sacroiliac (SI) joint; Dr. Chardoul repeated that Plaintiff should seek physical therapy (Tr. 166). Plaintiff presented to Ms. Graham and Dr. Chardoul again in October 2002 with similar complaints and examination findings (Tr. 165). Plaintiff was advised to stop smoking and to stay off of work (Tr. 165). Plaintiff returned to Dr. Chardoul later that month

with complaints of severe pain related to a "ruptured disc at L5-S1" and "right-sided sciatica" which limited his use of stairs (Tr. 164). Plaintiff also complained that he was easily fatigued and had angina "from time to time" with shortness of breath (Tr. 164). Dr. Chardoul opined that Plaintiff was "totally-permanently disabled" (Tr. 164). On examination, Plaintiff had a positive straight leg raise to 35 or 40 degrees on the right and severe muscle spasms (Tr. 164). Dr. Chardoul administered a shot of Solu-Medrol (a glucocorticoid), prescribed Vicodin (pain medication), and stated that Plaintiff should not be working at his job with the dosage of pain medication he was given (Tr. 164).

On November 4 2002, Dr. Chardoul opined that Plaintiff had not been able to work since May 2002 and would not be able to return to work until December 2002 due to "acute sciatica, disc protrusion at L5-S1 on the right side compromising the lateral nerve" (Tr. 197). Dr. Chardoul opined on November 20, 2002, that Plaintiff could not perform any work, including light sedentary work, until January 2003 (Tr. 196).

On November 26, 2002, Dr. Friedman examined Plaintiff for the state Disability Determination Service (DDS) (Tr. 148-53). Plaintiff presented with complaints of occasional chest tightness, and lower back pain radiating down the posterior aspect of the right leg to the foot/ankle with occasional right foot numbness (Tr. 148). Plaintiff reported taking several medications regularly and that he required nitroglycerine once a month (Tr. 148-49). On examination, Plaintiff ambulated with a normal gait and was able to walk on his toes and squat and rise from a full deep knee bend without pain (Tr. 149). Plaintiff could walk on his heels without difficulty, but complained of right hip pain (Tr. 149). Plaintiff was also able to step on to and off of a stool without difficulty, but complained of lower back/buttock pain when stepping

down (Tr. 149).  Plaintiff displayed active lumbosacral spinal flexion to 70 degrees and

extension to 20 degrees with complaints of pain (Tr. 149).  Plaintiff had no difficulty taking off

and putting on his shoes and pants, arising from a chair, and getting onto or off of the

examination table (Tr. 149).

Plaintiff presented to Dr. Chardoul in January 2003 with complaints similar to those he

expressed during his appointment in October 2002 (Tr. 162-63).  Dr. Chardoul noted that

Plaintiff had severe back pain, hypoactive deep tendon reflexes on the right, and numbness and

tingling radiating down his right leg (Tr. 162).  Dr. Chardoul recommended that Plaintiff have an

EMG of the right lower extremity (Tr. 162).  X-rays of Plaintiff's lumbosacral spine and

sacrococcygeal vertebrae that day revealed minimal degenerative changes of the lower lumbar

spine (Tr. 193).  Dr. Rivera performed an echocardiogram in February 2003 which revealed a

mildly depressed left ventricular systolic function with an ejection fraction of 45 to 50 percent

(Tr. 228).  Plaintiff presented to Dr. Rivera in December 2003 and reported that he was doing

very well (Tr. 224).  Dr. Rivera noted that imaging performed in November 2003 showed an

ejection fraction of 41 percent with no evidence of myocardial ischemia (Tr. 224, 226-27).  Dr.

Rivera informed Plaintiff that his stress test was quite good, but that he might have numerous

mild or moderate narrowings, all of which could cause myocardial infarction in the right setting

(Tr. 224).  Dr. Rivera recommended risk factor modification, including smoking cessation and

lower cholesterol (Tr. 224).  Dr. Rivera prescribed medication and also recommended that

Plaintiff perform at a minimum, 20 to 30 minutes of aerobic activity four times a week (Tr. 224).

Dr. Khullar, a cardiologist, performed an echocardiogram of Plaintiff in May 2005 which

revealed an enlarged left ventricle with significantly reduced systolic functioning and an ejection

fraction of 29% and fractional shortening to 11% (Tr. 332). The imaging also showed increased ventricular wall thickness consistent with increased muscle mass and abnormal wall motion consistent with an old myocardial infarction and coronary artery disease (Tr. 332).

An MRI of Plaintiff's lumbar spine in August 2005 revealed diffuse disc bulging and facet hypertrophy (increase in size of an organ or structure) causing bilateral neural foraminal (opening in the vertebrae) narrowing at L4-L5 (Tr. 333). The MRI also showed a small disc protrusion or herniation at the right inferior neural foramen at the same level, which the examining doctor opined may have been effacing the exiting nerve root (Tr. 333). Finally, the MRI revealed hypertrophy at L5-S1 and a very small disc protrusion on the right (Tr. 333). An MRI of Plaintiff's left shoulder the same day revealed findings consistent with two tendon tears as well as fluid in the subacromial/subdeltoid bursa (Tr. 334).

In April 2006, Plaintiff presented to Dr. Chardoul with complaints of severe back pain, progressive chest pain, shortness of breath, and ease of fatigue (Tr. 319A). Dr. Chardoul stated that Plaintiff's right-sided sciatica was so severe, that he was "paralyzed by it and unable to function" (Tr. 319A). Plaintiff stated to Dr. Chardoul that he could not lift more than five pounds on a continuing basis, and Dr. Chardoul noted that Plaintiff could not stand for more than two hours in an eight-hour workday with a need to elevate his legs frequently (Tr. 319A). Dr. Chardoul opined that based on those limitations, Plaintiff "should be unable to perform any kind of substantial, gainful activity" (Tr. 319A). Dr. Chardoul noted that at one point, Plaintiff had an ejection fraction of 29%, which put him "at risk for sudden death" (Tr. 320). On examination, Plaintiff had a positive straight leg raise on the right, with numbness and tingling down that leg and pain in his big toe (Tr. 320). An EKG yielded no diagnostically significant results (Tr. 320).

Dr. Chardoul wrote a letter the same day in which he stated that Plaintiff "obviously meets all the criteria of being totally, permanently disabled" (Tr. 319).  Dr. Chardoul opined that due to his back condition and cardiac disease, Plaintiff could not walk any distance, stand for any period of time, must sit and then stand, and could not perform sedentary work or lift more than five pounds (Tr. 319).  Dr. Chardoul stated that Plaintiff could not be gainfully employed due to his advancing age and limited skills (Tr. 319).

In December 2006, Dr. Sahouri and Ms. Graham wrote a letter "To Whom It May Concern" which stated that Plaintiff had been a patient of theirs for over six years and that he was unable to work (Tr. 310).  Dr. Sahouri and Ms. Graham stated that any work would jeopardize Plaintiff's health because he had bulging discs in his cervical and lumbosacral spine and coronary artery disease (Tr. 310).

In March 2007, Ms. Graham and Dr. Sahouri completed a medical source statement in which they opined that Plaintiff could frequently lift and carry less than ten pounds, stand and walk for less than two hours in a work day, and sit for less than six hours per work day (Tr. 335).  Ms. Graham and Dr. Sahouri also opined that Plaintiff had mild limitations in his ability to push and pull with his arms and legs and that he could not work for any amount of time (Tr. 335).

The next day, Plaintiff presented to Dr. Chardoul for a follow-up on his cardiovascular condition (Tr. 324).  In the treatment note, Dr. Chardoul repeated the limitations he described in April 2007 (Tr. 324).  Dr. Chardoul reported that an EKG that day was essentially normal and referred Plaintiff to Dr. Khullar for further examination (Tr. 324).

Later that month, Plaintiff presented to Dr. Chardoul for a follow-up appointment and Dr. Chardoul noted that Plaintiff had a "very positive" straight leg raise and that he was "very limited by paraspinous spasm" (Tr. 325). Dr. Chardoul stated that Plaintiff was "a big strong man, who can't [sic] much of anything" (Tr. 325).

The next day, Dr. Chardoul completed a medical source statement in which he opined that Plaintiff could: lift and carry 10 pounds occasionally; lift and carry less than 10 pounds frequently; and stand, walk, and sit for less than six hours in an eight-hour workday (Tr. 323). Dr. Chardoul also opined that Plaintiff had mild limitations in pushing and pulling with his arms and legs and that Plaintiff's limitations would likely disrupt a regular job schedule for eight hours per month (Tr. 323).

Four days later, Dr. Chardoul reported that Plaintiff had seen Dr. Khullar and that after a cardiovascular work-up, Dr. Khullar concurred that Plaintiff could not perform sustained activity (Tr. 327). Dr. Chardoul repeated the limitations he described earlier and concluded that Plaintiff could not "perform any type of substantial, gainful activity" (Tr. 327).

### 2.       Vocational Expert

The ALJ asked Vocational Expert (VE) Ann Tremblay a hypothetical question regarding what work could be performed by a person with Plaintiff's age, education, and work history who was limited to light work with the ability to alternate between sitting and standing (Tr. 349). The VE testified that such a person could perform work as a machine operator, assembler, and inspector, with a total of 19,300 jobs existing in the lower peninsula of Michigan (Tr. 349).

### C.     Plaintiff's Claims of Error

Plaintiff argues that the ALJ erred in finding that he was not disabled between his alleged onset of disability date – May 29, 2002 – and the date that he turned 55 years old, March 2007 (Pl.'s Brief at 6-15).  The ALJ found that Plaintiff was not disabled prior to age 55, because he could perform jobs existing in significant numbers in the national economy.  However, the ALJ found that Plaintiff became disabled when he turned 55 years old pursuant to the "Grid" rules found at 20 C.F.R. part 404, subpart P, appx. 2 (Tr. 273-75).

The ALJ first found that Plaintiff had the RFC to perform "light" work, with the additional limitation that he be permitted to periodically sit or stand (Tr. 270).  Based on the vocational expert's (VE) testimony, the ALJ concluded that he could perform a significant number of jobs (Tr. 273-74).  The ALJ then found that when Plaintiff turned 55 years old, Grid rule 202.01 directed a finding that he was disabled as of that date (Tr. 275).

Plaintiff contends that the ALJ should have found that he was limited to no more than "sedentary" work and was consequently disabled prior to turning 55 years old (Pl.'s Brief at 6-15).  The Grid, under rule 201.09, directs a finding of disability for a person who is limited to sedentary work and has Plaintiff's education and work experience if he is between 50 and 54 years old (described as "closely approaching advanced age" pursuant to 20 C.F.R. § 404.1563).  *See* 20 C.F.R. part 404, subpart P, appx. 2.  Plaintiff primarily argues that the ALJ should have adopted the opinions of his treating physicians – Drs. Chardoul and Sahouri – and concluded that he could perform no more than sedentary work (Pl.'s Brief at 7-14).

Defendant responds that substantial evidence supports the ALJ's rejection of those opinions because they lacked support, were not consistent with the lack of significant treatment, and appeared to be based on Plaintiff's subjective complaints (Tr. 272).

## III.    DISCUSSION

### A.    *Standard of Review*

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *See Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *See Bowen v. Yuckert*, 482 U.S. 137 (1987). If relief is not found during this administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "It is of

course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only. *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *See Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

### B.        *Governing Law*

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed.Appx. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq.*) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq.*). Title II benefits are available to qualifying wage earners who become disabled prior to the

expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled.  F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984).

While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).

"Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540. If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C.   *Analysis and Conclusions*

#### 1.   The ALJ Provided Good Reasons For Rejecting The Opinions Of Drs. Chardoul and Sahouri

Plaintiff's principal argument on appeal is that the ALJ did not provide good reasons for rejecting the opinions of his treating physicians – Drs. Chardoul and Sahouri – which concluded that Plaintiff was capable of no more than sedentary work (Pl.'s Brief at 7-14). Plaintiff acknowledges that the ALJ discussed why he did not accept numerous other opinions from his physicians, but argues that the ALJ was obligated to individually address an opinion by Dr. Chardoul signed on March 22, 2007, and an opinion signed by Ms. Graham and Dr. Sahouri on March 12, 2007 (Pl.'s Brief at 10, referring to Tr. 323, 335). Plaintiff cites *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004), to support his argument (Pl.'s Brief at 11). In *Wilson*,

the Court found that although substantial evidence otherwise supported the ALJ's decision, the Court nevertheless reversed the ALJ's decision because the ALJ failed to follow the procedural regulations and failed to give good reasons for not accepting a treating source's opinion. *See Wilson*, 378 F.3d at 546-47; 20 C.F.R. § 404.1527(d)(2) (the ALJ must articulate "good reasons" for the weight given to the opinion of a treating source).

As an initial matter, it does not appear that the ALJ was tasked on remand to completely reopen his review of Drs. Chardoul and Sahouri's opinions. Indeed, the ALJ correctly noted that Judge Borman's and the Appeals Council's remand orders did not challenge the ALJ's prior RFC finding that Plaintiff could perform a limited range of "light" work (Tr. 303).[1] Rather, the sole issue on remand was whether Plaintiff could perform his prior job as a lathe operator, and more specifically, if Plaintiff's job as a lathe operator permitted him to sit during the day.

In any event, even assuming that Plaintiff's RFC were an issue on remand, Defendant responds convincingly to Plaintiff's argument that the ALJ provided several good reasons for finding that Drs. Chardoul's and Sahouri's opinions were not entitled to the special weight afforded to treating medical sources. Specifically, the ALJ correctly found that Drs. Chardoul and Sahouri's opinions lacked support, were not consistent with the lack of significant treatment, and appeared to be based on Plaintiff's subjective complaints (Tr. 272). Each physician is discussed below:

---

[1] Indeed, the Appeals Council's remand order reads, in relevant part: "On October 7, 2005 an [ALJ] issued a decision finding that [Plaintiff] had the [RFC] to perform light work that provided for a sit/stand option (Tr. 20), and that he could perform past relevant work (PRW) as a lathe operator. The decision relied essentially on testimony by a vocational expert. However, reference to the vocational expert's testimony reveals that the lathe operator job would not have allowed [Plaintiff] to sit at all during the workday (Tr. 252). This requires clairification. Therefore, the Appeals Council vacates the decision issued October 7, 2005, and remands the case to an [ALJ] for further proceedings consistent with this order and the order of the court" (Tr. 303).

### i) **Dr. Chardoul's Opinions**

Defendant argues that the ALJ reasonably discounted Dr. Chardoul's opinions because he provided scant support for his conclusions and appeared to have simply accepted all of Plaintiff's complaints at face value (Tr. 272). Defendant's argument is well-taken. In order to be credited, a treating physician's opinion must be well supported. *See Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citations omitted) (While generally the opinions of a treating physician are given substantial, if not controlling, deference, they are only given such deference when they are supported by the objective medical evidence). Furthermore, when assessing a treating physician's opinion, an ALJ may consider the fact that the opinion was based on a claimant's subjective complaints. *See Crum v. Sullivan*, 921 F.2d 642, 645 (6th Cir. 1990).

Defendant is correct that Dr. Chardoul's numerous, extreme opinions that Plaintiff was totally and permanently disabled, "unable to perform any kind of substantial, gainful activity," and could not work due to his advancing age and limited skills are not supported by his treatment notes, which reflect relatively conservative treatment (Tr. 164, 167, 196-97, 319, 319A, 323-25, 327, 329). Furthermore, it is well-established that treating physicians' opinions that a claimant cannot work or was "disabled" are issues reserved to the Commissioner and opinions on those issues are not given any special significance. *See* 24 C.F.R. § 404.1527(e)(1) and (3); SSR 96-5p; *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("'The determination of disability is [ultimately] the prerogative of the [Commissioner], not the treating physician.' *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985).")

The ALJ provided good reasons for discounting Dr. Chardoul's opinions (Tr. 272). Indeed, with respect to Plaintiff's back condition, there is little evidence of significant treatment.

Dr. Chardoul injected Plaintiff with a glucocorticoid once in October 2002, but there is no evidence that he provided any other injections (Tr. 164). Dr. Chardoul and Ms. Graham recommended physical therapy on two occasions, but there are no records of any physical therapy (Tr. 166-67). Despite Dr. Chardoul's extreme opinions regarding Plaintiff's limitation resulting from his back condition, there is no evidence that he referred Plaintiff to any other specialists for treatment. Furthermore, the record contains no record of treatment by Dr. Chardoul between January 2003 and April 2006 (Tr. 162-63, 319A). Dr. Chardoul's treatment appears to have been confined to prescribing medication.

There is a similar lack of evidence after Plaintiff's alleged onset of disability date (May 29, 2002) documenting significant treatment for his heart condition. Although Plaintiff presented to Dr. Chardoul on numerous occasions after his alleged onset of disability, he was not often seen by his cardiologists, Drs. Rivera and Khullar (Tr. 224, 228, 327, 332). Plaintiff presented to Dr. Rivera twice in 2003 and reported at the second visit that he was doing very well, and Dr. Rivera noted that a recent stress test was quite good (Tr. 224, 228). There is no evidence of treatment of Plaintiff's heart condition by a cardiologist until nearly a year-and-a-half later, in May 2005, when Dr. Khullar performed an echocardiogram revealing decreased systolic functioning and an ejection fraction of 29% (Tr. 332). Finally, Dr. Chardoul reported in March 2007, nearly two years later, that Plaintiff had recently seen Dr. Khullar and that Dr. Khullar concluded that Plaintiff could "not do any kind of sustained activity" (Tr. 327). Although Dr. Chardoul often opined that Plaintiff was completely disabled due in part to his heart condition, there is little evidence that Plaintiff had significant treatment by a cardiologist after his alleged onset of disability date.

Given the lack of significant treatment of Plaintiff's conditions, the undersigned finds that the ALJ reasonably concluded that Dr. Chardoul's opinions were based primarily on Plaintiff's subjective complaints of debilitating symptoms. *See Crum*, 921 F.2d at 645. As such, substantial evidence supports the ALJ's conclusion that Dr. Chardoul's opinions were of limited probative value (Tr. 272).

### ii) Dr. Sahouri's Opinion

Defendant next argues that the single opinion signed by Dr. Sahouri and Ms. Graham was flawed for the same reasons as Dr. Chardoul's opinions. Defendant avers that there is almost no evidence in the record concerning treatment by Dr. Sahouri, meaning that it had even less support. Defendant's argument is well-taken. At the outset, it should be noted that Ms. Graham's opinion alone would not be entitled to the special weight afforded to opinions from treating physicians, because she was a physician's assistant. Only opinions from doctors, psychologists, or other "acceptable medical sources" are considered medical opinions. *See* 20 C.F.R. § 404.1527(a)(2). The term "acceptable medical source" does not include physician's assistants. 20 C.F.R. § 404.1513. Therefore, any special deference afforded to Dr. Sahouri's and Ms. Graham's opinion would be based on Dr. Sahouri's treatment of Plaintiff.

While Plaintiff testified that Dr. Sahouri had been treating him for six years, the record contains no treatment notes signed by Dr. Sahouri (Tr. 347). Indeed, Plaintiff does not refer to any treatment provided by Dr. Sahouri in his brief. As such, substantial evidence supports the ALJ's rejection of Dr. Sahouri's opinion because it lacked support, was inconsistent with Plaintiff's course of treatment, and appears to have been based on Plaintiff's subjective complaints (Tr. 272).

### 2. The ALJ Adequately Considered Evidence Relating to Plaintiff's Shoulder Ailments

Plaintiff also argues, in summary fashion, that the ALJ failed to properly consider an MRI performed on Plaintiff's left shoulder on August 23, 2005 (Pl.'s Brief at 14 citing Tr. 334). Plaintiff's argument is not well-taken. The ALJ noted in his decision that the record contained an August 2005 MRI of Plaintiff's left shoulder which revealed evidence of two tendon tears (Tr. 269, 334). However, the ALJ declined to ascribe any significance to this isolated piece of evidence because there was no conclusive evidence that Plaintiff had a shoulder disorder (Tr. 269). Plaintiff asserts that the ALJ failed to properly consider the MRI and Plaintiff notes that Dr. Chardoul mentioned shoulder pain in one of his treatment notes (Pl.'s Brief at 14). Plaintiff has not demonstrated that the ALJ's decision with respect to his left shoulder was unsupported by substantial evidence. There is no evidence that Plaintiff was diagnosed with a shoulder condition after his alleged onset of disability date and there is no record of any treatment for such a condition.

### 3. The ALJ's Hypothetical Question to the VE Was Supported by Substantial Evidence

Finally, Plaintiff argues that the ALJ erred in relying on the vocational expert's testimony that he could perform jobs existing in significant numbers in the national economy, because the hypothetical question the ALJ posed to the VE did not include all of his limitations (Pl.'s Brief at 6-7). However, a hypothetical question posed to the VE need only include those limitations that are supported by the record. *See Stanley v. Secretary of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994). For the reasons discussed above, the ALJ appropriately concluded that Plaintiff had the RFC to perform light work with the option to sit or stand at will (Tr. 270).

Therefore, the ALJ reasonably relied on the VE's testimony in response to a hypothetical question which included those limitations (Tr. 349).

In sum, after review of the record, the undersigned finds that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decision makers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## IV. RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.

S/Mark A. Randon
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE

Dated:  July 13, 2010

Certificate of Service

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, July 13, 2010, by electronic and/or ordinary mail.

S/Barbara M. Radke
Judicial Assistant